IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:04CR3081 |
| | ) | |
| v. | ) | |
| | ) | |
| MALCOLM ANDERSON, BRIAN | ) | REPORT, RECOMMENDATION, |
| PARKER, | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |
| | ) | |

The defendants have moved to suppress physical evidence obtained as a result of a June 15, 2004 traffic stop and subsequent search of their vehicle.  Filings 13 and 40.  They claim:

•   The traffic stop was illegal;

•   They were unlawfully detained following the stop;

•   The searches of their persons and vehicle were conducted without a valid consent to search;

•   The canine "Duke" failed to properly and reliably alert to the odor of illegal drugs; the canine sniff therefore provided no probable cause for searching the vehicle; and no other probable cause existed to justify the nonconsensual, warrantless search;

•   The canine sniff unjustifiably broadened a routine traffic stop into a drug investigation; and

•   For all the foregoing reasons, their arrests were not supported by probable cause.

See filing 13 at ¶ 3; filing 40 at ¶ 4.

As to statements made, the defendants move to suppress every statement made during the traffic stop, including those prior to arrest, claiming these statements are fruit of the alleged Fourth Amendment violations and were obtained in violation of their Fifth and Sixth Amendment rights.  They further move to suppress all

statements made after they were placed in custody and allege they
were subjected to custodial interrogation in violation of <u>Miranda</u>.
Filings 15 and 39.

An evidentiary hearing was held and post-hearing briefs were
due on March 28, 2005.   The motions are now fully submitted.
Having considered the evidence and legal arguments, I conclude the
motions to suppress should be denied.


FACTUAL FINDINGS

On June 15, 2004 at approximately 2:00 p.m., the defendants
were traveling east on Interstate 80 near Lincoln, Nebraska.
Defendant Parker was driving a silver Pontiac Bonneville  rented by
defendant Anderson, who was a front seat passenger.  See Exhibit 6
(photographs) at p. 1.

Trooper Chris Bigsby, a Nebraska State Patrol officer with
fifteen years of law enforcement experience (see exhibit 14), was
traveling west on the interstate at some point between  mile
markers 405 and 406 when he saw a group of five to seven eastbound
vehicles.  He specifically noticed the defendants' vehicle, as it
had Nevada license plates and based on the make and model year,
appeared to him to be a rental vehicle.

Trooper Bigsby entered the median and U-turned to follow the
eastbound group of vehicles.   While driving in the right lane
behind the group, Trooper Bigsby saw the defendants' vehicle enter
the left passing lane without signaling, pass a vehicle, and then
return to the driving lane by his estimate less than one and one-
half car lengths in front of the passed vehicle.  The defendants'
vehicle was not exceeding the posted speed limit.

2

Trooper Bigsby moved into the passing lane so he could better observe the defendants' vehicle. Anticipating that the defendants would change lanes and pass another vehicle, Trooper Bigsby manually activated his in-car camera without activating his overhead lights. Exhibit 1 (Bigsby videotape at 14:00:57).[1] At approximately mile marker 410, the officer observed the defendants' vehicle again enter the left passing lane without signaling, pass a vehicle, and return to the driving lane only one and one-half car lengths in front of the passed vehicle. Although defendant Parker did signal this last lane change, Trooper Bigsby decided to initiate a traffic stop for improper lane change (cutting directly in front and dangerously close to vehicles traveling in the right lane) and failing to signal his prior lane changes. See exhibit 4 (warning ticket).

Trooper Bigsby activated his in-car microphone, noted that it looked like a rental, drove closer to the defendants' vehicle so he could see the license plate numbers, and called those numbers into dispatch. Dispatch advised him that the vehicle was a rental car. The officer further observed the vehicle for secondary violations (e.g. failure to wear seatbelts) and to see how many occupants were present. Trooper Bigsby then pulled behind the defendants' vehicle and activated his lights to initiate a traffic stop. The stop occurred at approximately 2:02 p.m. at interstate mile marker 411. Exhibit 1 (Bigsby videotape at 14:01:25–14:02:40.

The defendants immediately pulled over. Trooper Bigsby exited his vehicle and went to the passenger side window of the stopped vehicle to speak with the defendants. As he approached the

---

[1] The Exhibit 1 videotape produced by Trooper Bigsby's in-car camera documents this traffic stop from shortly after the camera was manually activated until the defendants' vehicle was towed from the scene.

vehicle, he noted the smell of gasoline or petroleum products--an indication to him of either an aromatic leak, recent work on the vehicle, or the use of such products to mask the odor of illegal drugs.[2]

Trooper Bigsby told Parker the reason for the stop. In response to his request, Trooper Bigsby received both defendants' driver's licenses, the rental car agreement, and Anderson's Minnesota insurance card. See exhibits 2 & 3. Parker was asked to step out of the vehicle and be seated in the passenger side front seat of the patrol car. Defendant Anderson remained seated in the front passenger seat of the stopped vehicle. Exhibit 1 (Bigsby videotape at 14:03:15-14:04:30.

Trooper Bigsby asked Parker questions concerning the origin, purpose, and destination of defendants' trip. Parker explained that he and Anderson had flown from Minnesota to Las Vegas and had "hung out" there for four days at a friend's house. He stated that neither he nor Anderson gambled or saw any attractions. Trooper Bigsby noticed from the rental agreement the one-way vehicle rental to drive from Las Vegas to Minnesota cost over six hundred dollars. Trooper Bigsby asked Parker why he and Anderson were driving rather than flying back to Minnesota. Parker explained that they were unsure when they were returning to Minnesota so they decided to drive rather than purchase an airline ticket. Exhibit 1 (Bigsby videotape at 14:04:35-14:06:00.

At this point in the traffic stop, Trooper Bigsby, who has extensive training and experience in drug interdiction, was aware of the following indicators of illegal drug activity:  1) the

---

[2]He testified that the smell was not strong enough to indicate a gasoline leak, and therefore he did not instigate emergency safety measures.

4

defendants' car was a rental vehicle, and such vehicles are often
used for transporting illegal drugs; 2) the vehicle had a
noticeable smell of gasoline, and petroleum products are often used
to mask the smell of illegal drugs during transport; 3) the
defendants were driving from Las Vegas (DEA statistics indicate
that 65% of illegal drugs within the United States come from the
southwest, with Las Vegas being a source city within that area), to
Minneapolis, considered by the DEA as a destination city for
illegal drugs and a source of monetary proceeds of drug sales; 4)
the defendants flew to Las Vegas, but were driving back--which is
often done by drug traffickers to avoid airport security; and 5)
the defendants' trip was short in duration, and Trooper Bigsby knew
from his experience that drug trafficking trips are often short,
drug traffickers need to be ready to promptly transport their load,
but they sometimes need to wait for their load to arrive and have
nothing to do in the interim other than "hang out" and await a
call.

    Trooper Bigsby asked Parker if his license had ever been
suspended.  Parker said, "No."  The officer asked Parker if he had
ever been arrested, on probation, or paroled.  Parker responded
that he had one prior arrest which occurred twelve years earlier
(an assault in 1992).  In response to further questioning, Parker
identified Anderson's first name as "Malcolm" and stated Anderson
had, to Parker's knowledge, no criminal record.  Exhibit 1 (Bigsby
videotape) at 14:06:00-14:07:00.

    Less than five minutes after the stop was initiated, (see
exhibit 1 (Bigsby videotape) at 14:07:00-14:08:25), Trooper Bigsby
contacted dispatch to request a criminal history on both
defendants.  Criminal histories are checked to determine if there
are outstanding wants or warrants for the vehicle occupants, to
gain information which may be useful in ensuring officer safety,

5

and to determine if the vehicle occupants are trying to deceive the officer.  Trooper Bigsby believes that not only convictions but also arrests are relevant, no matter how long in the past the police contact occurred.

While awaiting a responses from dispatch, Trooper Bigsby asked Parker further questions about the trip--including when the defendants decided to fly to Las Vegas; when they flew to Las Vegas; when they rented the vehicle; and when they departed Las Vegas to return to Minnesota.  While completing Parker's warning ticket, Trooper Bigsby read Parker's driver's license and engaged in general conversation about where Parker's residential street address, Wynne Avenue, was located in St. Paul, Minnesota and its proximity to the 3M plant.  The trooper talked about his own past visits to the Minneapolis/St. Paul area.  Exhibit 1 (Bigsby videotape) at 14:08:35-14:11:00; exhibit 6 at p.2.

Further general conversation included confirming that Parker was a realtor and asking him whether his business remained good despite rising interest rates.  Trooper Bigsby also asked if Parker owned rental properties.  Exhibit 1 (Bigsby videotape) at 14:11:00-14:11:55.

The first response from dispatch concerning the defendants' criminal history occurred at 2:12 p.m.  Bigsby was told Parker's license was valid and there were no outstanding wants or warrants as to either defendant, but both had a criminal histories.  Trooper Bigsby asked dispatch to call his cell phone and provide him with complete information.  Exhibit 1 (Bigsby videotape) at 14:11:55-14:12:15.  While awaiting that call, the trooper asked how much the one-way plane ticket to Las Vegas had cost.  Parker responded that the ticket was $85.00.  The trooper commented that the one-way car rental to return home cost over $600.00.  He asked Parker how the

6

Pontiac was driving.  Parker's responded, "Not bad."  Exhibit 1
(Bigsby videotape) at 14:12:45-14:14:45.

Dispatch called Trooper Bigsby on his cell phone at
approximately 2:15 p.m. and talked to him for the about three
minutes.  Dispatch advised Trooper Bigsby that Parker's criminal
history included three arrests; a 1991 non-prosecuted arrest for
third degree assault; a 1992 arrest for second degree assault
(disposition held); and a 1993 arrest and misdemeanor conviction
for dangerous weapons.  Anderson's reported criminal history
included two March 1992 "acts prohibited" charges for which
Anderson was out on bail, and a April 1994 second degree drug
charge that was "pending investigation."  See exhibit 1 (videotape
at 14:14:58 to 14:18:42), exhibit 13 (audiotape), & exhibit 102
(Parker NCIC printout).

When the call from dispatch was complete, Trooper Bigsby asked
Parker again if he had only one prior arrest.  Parker confirmed
this statement.  The trooper exited his patrol vehicle at
approximately 2:19 p.m. and approached the driver's side of the
stopped vehicle to check the VIN number, speak with Anderson, and
return Anderson' driver's license and the rental papers.  See
exhibit 1 (videotape at 14:19:40).  Trooper Bigsby noticed,
however, that he had grabbed Parker's license instead of
Anderson's, so returned to the patrol vehicle and retrieved
Anderson's driver's license.  He then approached the passenger side
of the stopped vehicle and handed Anderson the rental agreement and
his license.  Trooper Bigsby asked Anderson if his license had ever
been suspended, and if he had ever been arrested, on probation, or
paroled.  Anderson stated he had one arrest for assault.  The
officer questioned Anderson about the origin, destination, and
purpose of the defendants' trip, and asked why he and Parker were

7

driving back rather that flying back to Minneapolis.  Anderson's responses about the trip were consistent with Parker's.

The trooper returned to his patrol vehicle at 2:23 p.m., and while seated with Parker, contacted Trooper Frye and asked him to come to mile marker 412 to discuss where they were going to eat. Troopers Bigsby and Frye have worked together for years and, to secure their safety without arousing suspicion before backup assistance can arrive, have developed their own coded method of communicating.  Trooper Bigsby's contact with Trooper Frye about a lunch location was, in reality, a message requesting assistance with this traffic stop.

At 2:24 p.m. Trooper Bigsby explained to Parker that he needed to allow more distance before returning to a lane in front of a passed vehicle.  He gave Parker his license and a warning ticket (exhibit 4) at 2:25 p.m., approximately twenty-three minutes after the stop was initiated.

Parker opened the passenger door and began exiting the patrol vehicle.  Trooper Bigsby said "Hey uh, Brian, do you mind if I ask you a couple more questions real quick?  Is that okay?"  Parker hesitated but responded "Okay."  See exhibit 1 (videotape at 14:25:40).  Trooper Bigsby stated that he noticed the cooler sitting in the backseat (exhibit 6 (photographs) at p.2), and asked what was in the trunk.  Parker said the cooler contained water and Anderson's diabetes medication.  Trooper Bigsby again asked what was in the trunk.  Parker said, "just luggage."  He denied carrying any packages for someone else.

The officer confronted Parker concerning his statement that he had been arrested only once while dispatch reported three prior arrests.  Parker explained that he did not know what "arrested"

8

meant, but admitted he had been "taken downtown" three times. Trooper Bigsby explained to Parker at the scene that the discrepancy in Parker's statements "raised a red flag;" he stated in his testimony that Parker's "false statements" about his criminal history caused the officer to suspect Parker was being deceptive.

Trooper Bigsby advised Parker that Anderson had likewise admitted to only one arrest, but actually had three prior arrests involving drugs. The trooper asked Parker if the defendants had possession of the vehicle since the time they left Las Vegas and whether Parker was responsible for everything in the car. Parker said he was responsible for himself and his own luggage, but not Anderson's.

When asked if there were weapons in the vehicle. Parker said, "No." Trooper Bigsby asked whether Parker's prior weapons charge involved the use of a gun. Parker explained that the weapons charge arose from using a gun to protect his property. Trooper Bigsby asked if there was any guns, alcohol, marijuana, cocaine, or methamphetamine in the vehicle. Parker answered "no" to each of these questions. The trooper asked whether any contraband would be found if the car was searched and Parker said, "No."

Parker stated he was nervous about answering these questions. The officer said he understood, and was trying to put the defendant at ease by explaining the officer's method of performing his job and his concerns about Parker's description of his criminal history. Trooper Bigsby asked if he could search Parker's bags. Parker said, "I can say no, right?" Trooper Bigsby answered, "Sure." Parker said he did not want his bags searched.

Trooper Bigsby stated he would speak with Anderson, who had rented the vehicle, and ask for his consent to search.  He asked Parker to shut the passenger side door of the patrol vehicle and stay inside where it was cooler and safer.

The trooper exited the patrol vehicle and approached the passenger side of the rental vehicle to speak with Anderson.  See exhibit 1 (videotape at 14:30:40).  He told Anderson that as a trooper, he sees a lot of contraband.  Trooper Bigsby told Anderson that he knew Anderson's criminal history included not one, but actually three arrests.  Trooper Bigsby asked Anderson if the vehicle contained more than luggage, had been in Anderson's control since rented, and whether Anderson was responsible for everything in the vehicle.  Anderson said the vehicle contained only luggage, and he was responsible for its contents.  Trooper Bigsby asked if there was any marijuana, cocaine, heroin, methamphetamine, or large amounts of cash in the vehicle.  Anderson said "No" to each of these questions.

Trooper Bigsby then asked if he could search the vehicle. Anderson replied, "No sir," and explained that he and Parker were already several hours behind schedule.

In addition to the indicators Trooper Bigsby noticed within the first five minutes of the traffic stop, he now also knew:  1) Anderson had a criminal history that included drug-related crime; Parker had a criminal history of assaultive behavior, and "people who haul drugs can be very volatile;" and neither defendant had told the officer the truth when asked about their criminal histories, and 2) the plane fare to Las Vegas from Minneapolis was only $85.00 per person but the defendants were spending $600.00 to drive home and offered only vague reasons for that decision.  Since

10

the defendants were unwilling to consent to a vehicle search,
Trooper Bigsby decided to request canine assistance.

Trooper Bigsby advised Anderson that he would be detained--he
was not under arrest, but he was not free to leave--until a canine
could arrive at the scene.  See exhibit 1 (videotape at 14:33:20).
Anderson was instructed to step out of the rental vehicle, place
the keys on roof, and stand in the ditch while awaiting the canine.
Anderson agreed to be patted down only partially and was therefore
required to stand near the fence for officer safety.

At approximately 2:35 p.m., Trooper Bigsby contacted dispatch
and asked if a police service dog was available.  See exhibit 1
(Bigsby videotape) at 14:35:30.  Trooper Frye arrived to assist at
approximately 2:37 p.m.  See Exhibit 11 (Frye videotape).

At approximately 2:50 p.m., Officer Jeremy Dugger, a certified
canine handler with the NSP Carrier Enforcement Division, was
driving eastbound on Interstate 80 near mile marker 409 en route
from his Lincoln, Nebraska home (near exit 403) to his assigned
duty station, the weigh station located near Waverly, Nebraska.  He
heard the dispatch radio traffic requesting canine assistance.
After receiving authority from his supervisor to assist Trooper
Bigsby, Officer Dugger contacted dispatch and stated he and his
canine partner, Duke, were available.  Duke is a narcotics-only
detection dog.

Officer Dugger and Duke arrived at the scene at approximately
2:52 p.m.  Because he was assigned to a truck weigh station where
trucks were searched off the highway in an area protected from
passing traffic, Officer Dugger had not previously handled a canine
at a traffic stop.  Duke, however, before being assigned to work

11

with Officer Dugger, had been the canine partner of Trooper Duis, who performs road patrol duties near Grand Island, Nebraska.

According to Officer Dugger, Duke tends to become distracted when performing canine sniffs and often requires "pre-stimulation." Pre-stimulation is an action taken by the dog handler to focus the dog's attention on the task at hand.  It does not tell the dog that something is present which needs to be found (as evidenced by the fact that it does not always prompt a positive canine sniff). Rather, pre-stimulation is a "ritual" that is part of the dog's training.  Typically it involves  the canine handler acting suspicious (e.g. pretending to hide a toy), to alert the dog that he is going to be asked to sniff the area or object that is the focus of the handler's actions.  Depending on the dog, it may be performed before every canine sniff deployment.  However, at a roadside stop where moving traffic poses a safety risk for the canine, the pre-stimulation process is a two-person job--one canine officer performs the ritual while another trained canine officer holds the dog's leash so the dog does not dart into traffic.

Officer Dugger and Duke trained together for seven weeks before becoming a certified canine team on April 2, 2004.  See exhibit 7.  Since that time Officer Dugger has spent one full day a week in canine training with Duke and an additional full day per month  in additional  canine training under the supervision of a canine trainer.  Since partnering with Officer Dugger, Duke was assigned to perform canine sniffs only at the weigh station, an atmosphere more controlled than the interstate with  fewer  moving vehicles to create distractions.

Duke's training performance documentation reflects that, with few exceptions, his search ability and performance are consistently graded at a level of 3.5 or better.  See exhibit 8.  A grade of "1"

12

is perfect; a grade of "6" indicates the dog was not suitable for
service; and a grade between 3 and 4 is average.  The records from
March 2004 through June 16, 2004 indicate that of the more than 150
canine sniffs performed by Duke during that time period, Duke
"indicated" that the odor of drugs on only four occasions (May 10,
2004, May 15, 2004, June 3, 2004, and June 16, 2004) when drugs
were not found during a followup search.  Officer Dugger testified
that in the case of May 10, 2004, the previous driver of the truck
had been fired for using marijuana and Duke likely smelled the
residual odor.  For the remaining dates, in addition to Duke's
alert or indication, numerous indicators of drug activity were
present and well-documented in Officer Dugger's records but drugs
were not found, in Dugger's opinion either because the scent of the
illegal drugs lingered even though the drugs had been removed, or
because the officer performing the search failed to find drugs that
were actually present.  See exhibits 8, 9, & 15.

When Officer Dugger and Duke arrived at the traffic stop,
Officer Dugger initially spoke with Trooper Bigsby and then
returned to his vehicle and retrieved Duke.  Officer Dugger
approached the passenger side of the vehicle with Duke, but Duke
was not paying attention to the vehicle or his task.  Officer
Dugger "metered him back" (started over).  See exhibit 1 (Bigsby
videotape) at 14:54:49-14:55:02.  Officer Dugger began a directed
canine sniff, walking around the vehicle and using his hand to try
to direct Duke's attention to smelling the car.  Duke still did not
focus on the vehicle, as evidenced by the fact that he was looking
at the roadway, in the ditch, or away from the vehicle and had his
tongue hanging out.  See exhibit 1 (Bigsby videotape) at 14:55:02-
14:55:51.  According to Dugger, a canine cannot breath in deeply
and effectively sniff for the scent of illegal drugs with its mouth
open and its tongue out.

13

Trooper Kurt Frazey, an NSP canine handler who recognized Duke, arrived at the scene, noticed Duke was distracted, and offered to hold Duke's leash while Officer Dugger pre-stimulated the dog.  See exhibit 12 (Frazey videotape) at 17:35:47.[3]   Officer Dugger accepted this offer, and with Trooper Frazey holding Duke's leash, Officer Dugger engaged in furtive movements designed to attract Duke's attention and focus it on his job.  See exhibit 1 (Bigsby videotape) at 14:55:51-14:56:25.  Officer Dugger then re-deployed Duke to perform a canine sniff.  Duke was now "on task," and when he reached the front driver's side corner of the vehicle, he alerted to the smell of illegal drugs, pulled Officer Dugger to the rear of the vehicle, and indicated to the location of the strongest scent by scratching at the seam of the trunk.  See exhibit 1 (Bigsby videotape) at 14:56:25-14:56:44.

Trooper Bigsby advised Parker that the dog had alerted to the odor of illegal drugs and told Parker that the vehicle would be searched.  The officer stated that if there was anything in the vehicle, Parker should tell the officers now, but Trooper Bigsby further emphasized that he was not making any threats or promises and Parker did not have to say anything.  Parker chose not to speak.  Parker was told to place his hands on the dash and keep them there for officer safety purposes.  Upon further questioning, Parker identified his bags.

Anderson was still located in the roadside ditch.  Troopers Frye and Frazey approached Anderson, advised him that the dog had indicated , and asked him if he had luggage in the trunk.  Anderson responded that both he and Parker had two pieces of luggage.

---

[3]The date and time references on the Frazey videotape are incorrect, but the videotape fairly and accurately memorializes events occurring during this traffic stop.

The search of the trunk began at approximately 3:00 p.m.  Five minutes later, Trooper Bigsby discovered what appeared to by illegal drugs in one of the suitcases.  Exhibit 1 (Bigsby videotape) at 14:57:00-15:58:15; exhibit 12 (Frazey videotape) at 17:37:00-17:40:00.

The defendants were handcuffed.  Trooper Bigsby read the Miranda warnings to Anderson and Parker from his NSP-issued advice of rights card.  See exhibit 16.  As each Miranda warning was read, both defendants verbally acknowledged that they understood their rights.  After Parker was advised of his rights, Anderson was also seated in Trooper Bigsby's patrol vehicle.  Discussions between Anderson and Parker while seated in the patrol vehicle can be heard on Exhibit 1, but the content of those conversations is barely perceptible, if at all, on the videotape provided to the court. Exhibit 1 (Bigsby videotape) at 15:06:45-15:08:35; exhibit 12 (Frazey videotape) at 17:45:00-17:49:30.

Trooper Bigsby conducted a field test of the suspected drugs. The testing was positive.  Exhibit 1 (Bigsby videotape) at 15:11:00-15:12:10.

Trooper Frye entered Trooper Bigsby's patrol vehicle and after confirming  that each defendant had been advised of his rights, spoke with both defendants and told them that illegal drugs were found.  He further advised them that drug offenses are taken very seriously by the prosecutors, public, and courts in Nebraska, and based on the type and quantity of drugs found, they were facing federal charges and harsh sentences which cannot be shortened by "good time" served.  Trooper Frye told the defendants that they could cooperate with law enforcement, and although he could not promise them anything, from past practice prosecutors usually "worked with" cooperating defendants.  He advised the defendants

15

that with their cooperation, a controlled delivery could be arranged so that the people the defendants were working for would never know the defendants assisted law enforcement. He made it very clear that the decision to cooperate was the defendants,' and offered them time to discuss it.

One of the defendants responded that there were too many loose ends, but "I can tell you this is on me." Trooper Frye asked him what that meant. There was no audible response.

The defendants were not willing to assist in a controlled delivery so Trooper Frye asked if they were willing to provide information to investigators. He further advised them that if they exercised their right to counsel, the officers would no longer discuss cooperation opportunities with the defendants. He told them of a prior case where a person transporting a similar amount of drugs was sentenced to thirty years imprisonment. He then reminded them that he was not trying to intimidate them or threaten them, but wanted to give them information helpful to reaching an educated decision.

Trooper Frye asked them if they knew what they were transporting, and questioned whose bag the drugs were found in. The defendants were not interested in speaking with investigators, so investigators were not contacted to perform interrogation or arrange a controlled delivery. Exhibit 1 (Bigsby videotape) at 15:14:30-15:20:47.

Trooper Bigsby transported the defendants away from the scene fo the traffic stop at approximately 3:25 p.m. In response to questioning by one of the defendants, Trooper Bigsby advised them that they were being charged with possession of illegal drugs with intent to deliver. Bigsby asked the defendants if they had

16

requested a lawyer, and told them that decision was theirs.  He
asked if they were willing to cooperate, and when they indicated
they were not, he advised them that depending on their criminal
history, they faced a possible sentence of ten to twenty-five
years.  The defendants made no responsive statements.  Exhibit 1
(Bigsby videotape) at 15:25:00-15:35:00.


                          LEGAL ANALYSIS


     The defendants claim the evidence obtained as a result of the
traffic stop and vehicle search, including any statements made my
the defendant before and after arrest, must be suppressed under the
Fourth Amendment.  They also raise Fifth and Sixth Amendment claims
in support of their motion to suppress statements.


     The defendants assert their vehicle was illegally stopped.
Trooper Bigsby witnessed the defendants' vehicle moving from lane
to lane to pass vehicles without signaling, and cutting in front of
the passed vehicles at dangerously close distances.  He initiated
a traffic stop.  The defendants claim Trooper Bigsby chose to stop
their vehicle because it was a rental car with out-of-state license
plates.


     It is well established that any traffic violation, no matter
how minor, provides a police officer with probable cause to stop
the vehicle.  United States v. Fuse, 391 F.3d 924, 927 (8th Cir.
2004); United States v. Herrera-Martinez, 354 F.3d 932, 934 (8th
Cir. 2004); United States v. Linkous, 285 F.3d 716, 719 (8th Cir.
2002); United States v. Alcantar, 271 F.3d 731, 736 (8th Cir. 2001).
"Courts are not to consider the motive for a stop as long as the
reason for the stop is valid."  United States v. Jones, 275 F.3d
673, 680 (8th Cir. 2001).  Although a traffic stop cannot be

                              17

pretextual, "so long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop." <u>Alcantar</u>, 271 F.3d at 736.  See also, <u>Whren v. United States</u>, 517 U.S. 806, 812 (1996); <u>United States v. Bell</u>, 86 F.3d 820, 822 (8th Cir. 1996).

"Nebraska law prohibits turning a vehicle or moving right or left upon a roadway without an appropriate signal." <u>State v. Chronister</u>, 3 Neb. App. 281, 285, 526 N.W.2d 98, 103 (1995) (interpreting <u>Neb. Rev. Stat</u>. §§ 60-6,161 to 60-6,163 as requiring the use of a turn signal when changing lanes).  See also, <u>State v. Hawes</u>, 1996 WL 106247 at *6 (Neb. App. 1996) (holding defendant's failure to signal when changing lanes was sufficient to justify the traffic stop under the Fourth Amendment).  Trooper Bigsby observed the defendants' vehicle  changing lanes without signaling, and this observation justified initiating a traffic stop.

Nebraska law also provides that "[a]ny person who drives any motor vehicle . . . carelessly or without due caution so as to endanger a person or property shall be guilty of careless driving." Neb. Rev. Stat. §60-6,212.  From the standpoint of public safety, a trooper's observation of conduct that threatens motorist safety violates Nebraska's careless driving prohibition. <u>Crooks</u>, 326 F.3d 995, 999 (interpreting Nebraska law).  "No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety. . . ."  Neb. Rev. Stat. § 60-6, 161.  A driver being passed must "give way in favor of the overtaking vehicle," (Neb. Rev. Stat. § 60-6,133(2)), and a passing vehicle shall proceed "at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle."  Neb. Rev. Stat. § 60-6,133(1).  Unsafely pulling out in front of a passing vehicle or pulling into the right

18

lane too close in front of the passed vehicle, in essence, "cutting it off," violated Nebraska law and warranted stopping the vehicle. <u>United States v. Humphrey</u>, 2002 WL 1485387, *1 (D. Neb. 2002)(probable cause supported trooper's traffic stop where defendant who was driving on interstate highway had passed trooper on the left and re-entered right driving lane in front of cruiser, with only one to one-and-one-half car lengths between the two vehicles).

Even assuming his primary motivation was to stop a rental vehicle with Nevada license plates, Trooper Bigsby did not violate the defendants' Fourth Amendment rights when he stopped a vehicle for violating Nebraska law by failing to signal and improperly changing lanes. "Any traffic stop is constitutional, no matter the officer's actual motive, so long as the officer had probable cause to believe that a traffic violation actually occurred." <u>United States v. Long</u>, 320 F.3d 795, 798 (8th Cir. 2003).

The defendants claim they were unlawfully detained and subjected to questioning following the traffic stop. They argue that even if the traffic stop was valid, Trooper Bigsby unlawfully extended it beyond the scope of writing a warning ticket for failure to signal and improper passing.

After stopping a vehicle, the trooper may lawfully ask any questions reasonably related to the stop, which typically include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose. <u>United States. v. Ramos</u>, 42 F.3d 1160, 1163 (8th Cir. 1994) (citing <u>United States v. Barahona</u>, 990 F.2d 412, 416 (8th Cir. 1993); <u>United States v. Richards</u>, 967 F.2d 1189, 1192-93 (8th Cir. 1992)). The officer may detain vehicle occupants while performing the routine tasks of writing a citation, and

19

completing computerized checks of a driver's license, vehicle registration, and criminal histories of the vehicle occupants. Fuse, 391 F.3d at 927; United States v. White, 81 F.3d 775 (8th Cir. 1996).

The defendants claim Trooper Bigsby unreasonably expanded the traffic stop by questioning not only Parker, the driver, but Anderson, the passenger. They further argue that a criminal history check, which served to delay their detention in this case, was not reasonably related to the traffic stop. An officer does not violate the Fourth Amendment by speaking with the driver and passenger, and asking both of them questions about the origin, purpose, and destination of their trip. See e.g. Allergee, 175 F.3d at 650 (no Fourth Amendment violation where the sheriff separately questioned the driver and passenger and developed reasonable suspicion of criminal activity based on the divergence between their answers). Such questions are considered reasonably related to the purpose of the traffic stop.

Moreover, detaining a person for a reasonable period to conduct a criminal history search through the National Crime Information Center (NCIC) computer does not violate the Fourth Amendment. United States v. McManus, 70 F.3d 990, 992 (8th Cir. 1995). "The objective safety risks to officers during routine traffic stops in general have led courts to approve reasonable steps to insure officer safety, including asking the driver and passengers of a stopped car to exit the vehicle and conducting routine criminal history checks." United States v. Holt, 264 F.3d 1215 (10th Cir. 2001). Many officers are shot during routine traffic stops each year. An almost simultaneous computer check of a vehicle occupants' criminal records, along with the driver's license and the vehicle registration, is reasonable and not intrusive. United States v. McRae, 81 F.3d 1528 (10th Cir. 1996).

Therefore, requesting criminal histories is part of a routine computer check during traffic stops and is justified for officer safety. United States v. Purcell, 236 F.3d 1274 (11th Cir. 2001). The results of a criminal history check are useful to determine whether further back-up or other safety precautions are necessary. United States v. Finke, 85 F.3d 1275 (7th Cir. 1996).

The defendants' vehicle was stopped at 2:02 p.m. Within the first four minutes of this traffic stop, Trooper Bigsby had determined that the defendants were driving a rental car (rental vehicles are often used for drug trafficking) from a drug source city, Las Vegas, to a drug destination city, Minneapolis; had flown to Las Vegas to "hang out" there for only four days, and were now spending $600 to drive a rental vehicle home; and for no apparent reason, this otherwise clean and recent model rental vehicle smelled like petroleum products--which are sometimes used to mask the odor of illegal drugs. Although each of these factors alone "is susceptible of innocent explanation, and some factors are more probative than others," a "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 277 (2002).

Trooper Bigsby has training and experience in criminal drug interdiction, and he offered explanations for his suspicion that the facts he discovered during the first five minutes of this traffic stop indicated the likelihood of illegal drug activity. I conclude that under the totality of the circumstances, Parker's answers to questions concerning the origin, destination, and purpose of this trip, the facts revealed in the rental documents, the type of car the defendants were driving, and the odor detected by the officer when he approached the vehicle provided a basis for Trooper Bigsby to reasonably suspect criminal drug activity. See e.g. United States v. Yang, 345 F.3d 650, 656 (8th Cir.

2003)(officer had reasonable basis for suspecting criminal activity
where vehicle driver was coming from a drug source state; had flown
to Texas to purchase a high-mileage car and to drive it back to
Minneapolis; claimed he was hurrying to get home but was driving
under the speed limit and making frequent overnight stops, was
traveling with a cell phone and items indicating he did not want to
stop; and gave uncommon answers to questions about crime and
narcotics); United States v. Riley, 927 F.2d 1045 (8th Cir.
1991)(officers reasonably suspected drug activity where a passenger
purchased a one-way flight from a known drug source city to a known
destination city, wore business attire on late night flight, did
not have enough luggage for a trip lasting several days, luggage
was padlocked, he appeared to be nervous, and his appearance did
not match the style of the checked luggage); United States v.
Jones, 44 F.3d 860, 863 (10th Cir. 1995)(reasonable suspicion
existed where car was a large rental vehicle; was being driven from
Los Angeles to Detroit, two cities associated with high drug usage;
occupants had purchased one-way plane tickets to Los Angeles and
rented the car for their return trip, allegedly because they had
run out of money on their vacation; the car did not immediately
stop; the passenger's picture appeared more sophisticated on her
driver's license; and she was not nervous, suggesting that she may
have been stopped under similar circumstances previously).

The defendants claim that as the traffic stop progressed,
Trooper Bigsby expanded his questioning beyond those related to the
traffic stop, which led to an unreasonably lengthy detention. When
the responses to questions and the circumstances of the stop "give
rise to suspicions unrelated to the traffic offense, an officer may
broaden his inquiry and satisfy those suspicions" asking
additional, more intrusive, questions. Jones, 269 F.3d at 926-27;
Ramos, 42 F.3d at 1163. "[T]he line that separates a traffic stop
from an investigative stop is generally difficult to draw and

artificial." <u>United States v. Long</u>, 320 F.3d 795, 801 (8th Cir. 2003). "[A]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop." <u>Long</u>, 320 F.3d at 800.

Upon review of the videotape, what started as a traffic stop evolved into an investigatory stop. Trooper Bigsby's questioning expanded in response to the unusual trip details offered by the defendants, their failure to accurately describe their criminal histories, and other indicators seen at the time of the stop. Trooper Bigsby's manner was professional throughout. I find no evidence that he coerced these defendants to speak with him, or that their responses were anything other than voluntary.

Despite the developing investigatory nature of this traffic stop, Trooper Bigsby returned Anderson's license and rental car agreement, and handed Parker his license and warning ticket seven minutes after receiving the criminal history information from dispatch and within twenty-three minutes after the vehicle was initially stopped. Although the defendants argue otherwise, I conclude that under the totality of the circumstances presented, this length of detention for the traffic stop was not unreasonable and did not result in an unlawful detention in violation of the Fourth Amendment.

After receiving his warning ticket, Parker Bigsby began to exit the vehicle. Trooper Bigsby asked Parker if he would answer a few more questions and Parker agreed to do so. Anderson was still waiting in the rental vehicle. The defendants claim they were unlawfully detained for this questioning in violation of their

Fourth Amendment rights, and the questioning also violated their Fifth Amendment rights.

"[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991). An objective standard is used to determine whether there has been a seizure. The question is whether a reasonable person in the same circumstance would have felt free to leave. United States v. Morgan, 270 F.3d 625, 630 (8th Cir. 2001). Although questions about drugs concern a sensitive topic, this questioning does not in itself create an inherently coercive environment. There is no evidence that Trooper Bigsby did anything to suggest that Parker was required to engage in a conversation, and the officer was not required to advise Parker that he was free to leave. Parker could have stated he was unwilling to answer questions and not engaged in the conversation. Upon thoroughly examining the videotape, I conclude Trooper Bigsby did not impermissibly detain Parker and Anderson by engaging them in questions after issuing the warning ticket. See Morgan, 270 F.3d at 630 (after warning ticket issued, starting a conversation with the driver about drug interdiction was not an impermissible detention even though driver stated she did not subjectively feel free to leave).

After asking additional questions, Trooper Bigsby asked both Parker and Anderson if they would consent to a search of the vehicle. Both denied consent to search. Trooper Bigsby then advised both defendants that they would be detained until a dog arrived to perform a canine sniff. The defendants claim this detention violated their Fourth Amendment rights.

Once Trooper Bigsby issued the warning ticket to Parker, he could not continue to detain Parker and Anderson absent a reasonable, articulable suspicion for believing criminal activity was afoot. "With the purpose of the traffic stop completed, it would be an unreasonable extension of the scope of the investigation for the trooper to further detain the suspect or his vehicle, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." Fuse, 391 F.3d at 927-28.

However, by the time the warning ticket was handed to Parker, in addition to the indicators discovered during the first five minutes of this traffic stop, Trooper Bigsby had also discovered that both defendants initially understated their criminal histories, and that flights between Las Vegas and Minneapolis cost substantially less than renting a one-way vehicle, which further undermined the credibility of the defendants' story. Trooper Bigsby had reasonable suspicion of criminal activity, and that suspicion did not evaporate when the warning ticket was issued. "[T]he termination of a traffic stop does not effectively erase the objectively reasonable suspicions developed by a police officer during the traffic stop." Fuse, 391 F.3d at 929.

Detaining the defendant's vehicle while awaiting the drug dog was not unreasonable.

> When police need the assistance of a drug dog in roadside Terry stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times. Courts must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."

United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994)(quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).

Trooper Bigsby called for canine assistance immediately after the defendants refused to consent to a vehicle search. The canine arrived less than twenty minutes later, and was deployed upon arrival. The officer's response was not dilatory. Trooper Bigsby was diligent in carrying out his duties, and the length of defendants' detention prior to arrest was not excessive. Under such circumstances, waiting approximately an hour for a drug dog to arrive was not an unreasonable detention in violation of the defendant's Fourth Amendment rights. United States v. White, 42 F.3d 457, 460 (8th Cir. 1994)(finding delay of one hour and twenty minutes for arrival of drug dog reasonable); Bloomfield, 40 F.3d at 916-17 (one hour wait from time of stop to arrest, part of which was waiting for a drug dog, was reasonable).

The defendants argue that Duke was not a reliable canine for drug-detection purposes. However, the evidence establishes that Duke successfully passed his certification training with Officer Dugger, received both weekly and monthly maintenance training, and while not absolutely perfect and sometimes easy to distract, his overall performance is very good. Though he defendants claim he alerted on occasion when no drugs were present, Duke is trained to detect the odor of drugs, not their presence. Moreover, the alleged "false positive" events were explained well by Officer Dugger and his documentation.

Though substantial testimony was offered concerning Duke's inattentiveness on the first two passes around this vehicle, it is clear from the videotape that when Duke started paying attention to his job and not his surroundings, he immediately alerted to the odor and indicated the location emitting the strongest odor of

26

drugs. Drug detecting dogs are not foolproof, especially considering that drug traffickers have found ways to mask the odors of contraband to fool detection efforts. United States v. Jodoin, 672 F.2d 232, 236 (1st 1982).

Duke's positive indication of the presence of drugs in the trunk area of the car was reliable and provided a substantial basis for concluding there was a fair probability that drugs would be found in that location. United States v. Delaney, 52 F.3d 182, 188-89 (8th Cir. 1995). Once probable cause was established, the car could be searched without a warrant under the automobile exception to the warrant requirement. Bloomfield, 40 F.3d at 918. Once the drugs were found, there was probable cause to arrest the defendants.

The defendants were arrested, handcuffed, and read their rights under Miranda. Prior to being handcuffed, though not free to leave, they were also not in custody and their statements were not the result of custodial or coercive interrogation. After being advised of each of their rights, there was no clear invocation of the right to counsel. They answered some questions posed, but remained silent as to most questions.

Both defendants are English-speaking adults who were clearly advised of their Miranda rights. They did not appear to be under the influence of any drug or alcohol. The officers who spoke with and questioned the defendants after their arrest did not promise the defendants anything in exchange for their cooperation, and did not use words, demeanor, or conduct to intimidate, coerce, or threaten the defendants. The questioning was brief, and the defendants chose not to cooperate with the officers in performing a controlled buy or becoming informants. There is nothing in the record to indicate that the defendant's will to remain silent was

overborne, nor their capacity for self-determination critically impaired. <u>United States v. Santos-Garcia</u>, 313 F.3d 1073, 1079 (8th Cir. 2002).

I therefore conclude defendants' motions to suppress based on the Fourth, Fifth, and Sixth Amendments should be denied.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B), as follows:

   a.  Defendants' motions to suppress evidence found during the vehicle search, filings 13 and 40, be denied.

   b.  Defendants' motions to suppress statements, filings 15 and 39, on the basis of the Fourth, Fifth, and Sixth Amendments be denied.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT FURTHER HEREBY IS ORDERED:  Trial is set for 9:00 a.m. on June 6, 2005 for a duration of three trial days before the Honorable Richard G. Kopf. Jury selection will be at the commencement of trial.

DATED this 13th day of April, 2005.

                              BY THE COURT:

                              s/ *David L. Piester*
                              David L. Piester
                              United States Magistrate Judge

28